Thank you, Your Honor, and I would like to see if I can keep two minutes up by ten minutes for rebuttal. May it please the Court, I understand I have an uphill argument when I'm arguing about sufficiency of the evidence, but people do get to the summit of Everest every year, and even if the Court disagrees with me, I think there's such a weak evidentiary showing here, it really goes to show that the other errors in this case cannot be harmless. When you look at the evidence against Eduardo Abad, I mean, it's incredibly thin. When I was reviewing the briefs before coming to the Court, I was looking at the government's statement of facts, and it was just stunning to me to realize that the only facts that the government cites against Eduardo Abad are that he was paid for finding beneficiaries, he referred those people to his personal doctor for an evaluation, he went on some home visits with his personal doctor, and he would have to replace some beneficiaries if they were not eligible. And Colostro was his personal doctor? Yes. But we now know more about Colostro than that she was his personal doctor. We know she was an integral part of this fraud. That's correct. But she was his personal doctor. She was his personal doctor since 2006. At trial, there was a substantial amount of medical records that were introduced regarding their doctor-patient relationship. She provided him medication for diabetes. She supervised his knee replacement. Let me just ask you a question about the nature of the evidence. The evidence does show that some of the patients that he referred to Dr. Colostro were the ones for whom she wrote prescriptions without seeing them. Isn't that correct? Ten patients. No, no. She saw all of those patients. But she wrote prescriptions for them and later said they didn't. This was part of my scheme. Well, the evidence on that is ambiguous. Dr. Colostro testified, and it's my reading of her testimony, that she said that each of the prescriptions that she wrote was medically necessary. She said that on multiple occasions on both direct and in cross-examination where she said that these prescriptions were medically necessary. Even though that she was a government witness, she didn't give the government everything the government wanted. She said that she conducted at least a 30-minute medical examination with each of those patients and, in her medical opinion, the wheelchairs were medically necessary. And when you look at those individual patients, it's very clear that Mr. Abad was told to get people who had difficulty walking, who were elderly, who were infirm, who were losing canes. The two witnesses that testified against him at trial, one of them used a cane to walk up to the witness stand. And there's no evidence that Mr. Abad had any medical training. All these people were elderly and infirm, and the only evidence for Mr. Abad is a total of 10 wheelchairs, which is the only documentary evidence, and that's completely consistent with his statement to the FBI that he was paid $100 on 10 occasions to refer patients to his doctor for an independent evaluation. But wasn't there other evidence? I guess maybe you can speak to this. It seems like FBI agents testified that Mr. Abad lied about how much he was paid for referring people to Dr. Colostro and about how often he spoke with Sogbine. I think they testified there were hundreds of contacts between Mr. Abad's phone and Mr. Sogbine's phone. And there was also evidence, I think, the other recruiter testified to statements that Abad made about how much money he was making from doing this. So, I mean, we have to look at this in the light most favorable to the government. I mean, some of those, if you could address some of those specific... I'll do that, and I understand the court's question. I'm not trying to argue with the court, and I understand... And I'm not arguing. I'm just raising these issues. And I understand why that issue is before the court, because the government's arguments imply that, the government's briefs comply that, but that doesn't comport with the record. In fact, what happened was that Abad was interviewed by the FBI on two separate dates. He was interviewed by the FBI on October 17th, and again he was interviewed on October 28th. And when he was interviewed by the FBI on October 17th, he answered every question that he was asked completely truthfully, except for one, and I'll get to that later. Well, he did refer to being paid lunch money. Yes, he referred to being paid lunch money from Dr. Colostro, and that's completely true. In that first meeting, he was not asked if he was paid any money by Sogbine. He simply was not asked that question. It was only in the second meeting when he was asked if he was paid money by Sogbine, and he said, yes, Sogbine paid me. He paid me $100 on 10 separate occasions. Judge McGee asked you about Savera's testimony. Savera says, essentially, I'm a government cooperating witness.  This was a fraud. And seems to implicate Abad also. Would you address that? I don't think she does implicate Abad. In fact, Savera testifies that she had a conversation. Sorry, I can't tell gender from these numbers. I'm sorry. You're right. She testified that she had a conversation with Sogbine about keeping information from Abad. Colostro, the doctor, also testified that she had a conversation with Sogbine about keeping information from Abad. Let me posit something for you and just see if you respond to it. Savera basically implicates herself. Correct. And says, and there's another guy out there doing the same thing that I'm doing. She doesn't say that, but Abad's conduct is pretty much the same as hers, finding people, referring them to Dr. Colostro, then having them have wheelchairs provided by Sogbine, and your client's in contact with Sogbine. So just those facts for a second. Is that enough to get to the jury? No, it isn't, because there has to be some showing of knowledge that Abad knew that the overall scheme was fraudulent, that there was something fraudulent with this. And there's no showing that he knew this was fraudulent. The only showing is that people were finding elderly people who may be eligible for wheelchairs and that Dr. Colostro evaluated those people and she made the decision. It wasn't Savera who made the decision. It wasn't Abad that made the decision. Dr. Colostro admitted that she never did the appropriate evaluation to determine whether these wheelchairs were medically necessary. She testified on at least two occasions that her examination convinced her that these wheelchairs were medically necessary. Maybe I'm misrecalling the record. Didn't she testify at some point that she had not done the evaluation she should have done on these people? She testified that after she was arrested, after she spoke to the FBI, she learned what she was supposed to do. She learned that there were additional medical standards that she should have complied with, and she did not comply with those. Yes, she testified to that way. But she did not testify that at the time she was conducting the examinations that she was actively committing a fraud. She said the result of these evaluations were that, in her belief, the wheelchair prescriptions were medically necessary. Help me again on the record, since you're arguing sufficiency of the evidence. Does the record reflect that Dr. Colostro saw each and every one of the people? Yes. Not only from your client, but from the other people? I can't absolutely say that the record reflects she saw everyone, but there was never a claim that she did not see any of the patients that a wheelchair was prescribed for. The testimony was pretty consistent that she saw everybody, and I'd like to reserve two minutes. Do you want to take your time? Yes, thank you. Okay. Good morning, Your Honors, and may it please the Court. My name is Mark Ebert, and I represent Ms. Adebola Adebimpe, who is known to everyone as Addy.  I'd like to spend most of my time on the amount of loss issue, which is common to both myself and Mr. Sobine. Regarding loss amount, the district court counted for intended loss purposes 100 percent of what the government claimed was billed by both Debs and Dignity in calculating the loss for both of these defendants, Addy and Mr. Sobine. And I have two points to make about that. The first is, as I pointed out in my brief, the government witnesses, three of them, testified that Medicare only pays a maximum of 80 percent of the cost of the DME equipment, and that in Dignity's case, that came to about 50 percent of the amount billed. But they only pay 80 percent. I said it in my reply brief. There were two – let me see. It was right at the very beginning of my reply brief. There was a government agent, an FBI agent. There was an expert in – I believe it was the Neridian witness, and my thing isn't working now. But it's at the very – that's this very first thing, I think, in my reply brief. I list the three government witnesses. They were all three of them experts. You know, in the certification that the provider signs with the reimbursement – what's it called, the Medicare? Neridian is the intermediary Medicare. Right, but when the provider joins and becomes part of the Medicare system, they sign a certification. Right. And agrees to abide by all the rules. Right. Are there any rules that say that you're only going to get 80 percent of what you submit? I don't know in the certification that they sign, but I know that that is the rule. They're going to abide by all the rules, right? Right, and the rules are 80 percent. They only get 80 percent? Eighty percent of the cost of the DME. So, for example, if you bill a million dollars for a wheelchair, you're not going to get 80 percent of a million. It's the cost to the DME. And, in fact, that's even in the superseding indictment itself at page three, which says that Medicare through Neridian would generally pay a portion, usually 80 percent, of the cost of the DME and related items. And we have three government witnesses who said that, and we also have the pre-sentence report determining that the government witnesses were correct, that Adibimpe's company only got 50 percent. So he submitted the bill for, like, let's say $3,000. Right. He knew he was only going to get 80 percent of that. He knew he was going to get 80 percent of that as adjusted by the cost. In other words, again, you don't get 80 percent of a million if you do that. The best evidence of what they expected to get was what they did get for three years, which the PSR determined was $818,000. And so if you look at it... What effect would that have had on the loss item? Okay. There were two different arguments. Right. They both make the same adjustment. Do you deal with your 80 percent argument? Four points. Four points lower in the guidelines. If you... What would have been the amount? Okay. With your 80 percent argument. Okay. Again, it's 80 percent as adjusted by cost. What would be the loss? Excellent question. I've already calculated that. The government and the court found that when you add it all up, it's $1.77 million. $1.77? $1.77 million. That's right. If you subtract out the DEBS claims, which is actually the next argument... No, don't do the next one. Okay. Do this one. If you do the amount received by Dignity, it's $818,000. Okay. And that is the foreseeable amount because that's what you got. And the government said over and over and over again that Ms. Adebempe knew what the rules were and was involved in her own business. Let's walk through this a little bit because there's a pop-off case that says the prima facie evidence of the intended loss amount is the amount of claims submitted to Medicare, right? Right. So what was the amount that you claimed she submitted to Medicare? She submitted... Again, that gets to a separate argument, which is DEBS versus Adebempe. That's where the district judge, I think, has to start off with. That's what the law indicates. And then he can make adjustments based on the evidence that you come up with on her behalf. And it seems like the judge made a determination, and I want to know what you think we need to do with the determination in light of your argument that Ms. Adebempe was only expecting to be paid 50% to 8% of the amount of submitted claims. The district court said, I think, in response to that, that Adebempe intended to defraud Medicare of the full billed amount because the evidence did not specifically show that Adebempe knew that she would not receive the full amount and because the defense provided falsified documents to make it as likely as possible that they would be repaid. I think we have to review that for clear error because that's a factual finding. Again, the only reason I'm having trouble giving you the number is because I have two arguments that play together. But to answer your question, whether or not the pop-off presumption was met is a question of law, or at best, whether it's a mixed question of law or law and fact. Here we have the indictment saying you pay 80% of the amount of the cost. And you have three government witnesses saying that. The intended loss. The intended loss. That's what Judge McGee is asking. The district judge found that there wasn't any evidence that your clients knew that it was an 80% payment and that, therefore, they intended the entire loss to be paid. And I respectfully disagree because the government kept saying she knew all the rules and the rule was 80%. But what is our standard of review when the district court makes that determination? If it's the pop-off presumption, whether it was met, it's a question of law, or at best, a mixed question of law and fact. This is a question of fact, though. I respectfully disagree. No, no, no. You can argue the law on whether it's the prima facie standard and all of that. But when he makes a factual determination based on all of the evidence of what he finds the defendant's intent to be, I mean, based on the evidence before him, I think it's clear error. If that is what the court is going to decide, then I would say that if the ‑‑ I'm just asking you, that's what we're dealt with here. I respectfully disagree, but even if you go to clear error, you have ‑‑ Tell me how you respectfully disagree. Because the question is whether the pop-off presumption is met. The pop-off presumption is met by the billings. Pop-off presumption says we'll presume that the ‑‑ It's rebuttable presumption. It's rebuttable. So the presumption arises from your billings. Pop-off is now done. Now you've got a rebut. And you say, here's my rebuttal. We only got paid $800,000, and everybody knows that you only get 80%. Including Ms. Adebempe. Including Ms. Adebempe. And the judge says, oh, no, as a matter of fact, I don't find any evidence that Ms. Adebempe knew that. And I think she intended that the government lose the entire amount. So the pop-off presumption arises from the billings. You get to rebut it. The judge says you haven't rebutted it. Why was the judge wrong? If that is the standard the court is going to use, you have the fact that the indictment ‑‑ Okay. I'm using my cookout. Go ahead. Just answer these questions. Don't worry about it. The indictment itself says 80% is adjusted for cost. Three different government witnesses said the same thing. The actual amount was $818,000. Let me ask the same question. I'm asking the question badly because you're responsive. What evidence is there that Ms. Adebempe knew that the billings would only produce 80%? Number one, what she received. And number two, that the government witnesses argued again and again and again. She signed documents saying that she knew what the rules were. She told the FBI one question what the rules were. She signed the certification and joined the program. She said I'm going to abide by all the rules. If you go to the rules in the regs, does it say you're only going to get 80% of the cost? That is what Medicare says. Was that in the record here that she saw that? It's in the indictment. Yes, yes. It is in the record that she knew all of the rules. It's in the record that the government says. But is there a rule? Is there a rule saying you're only going to get 80%? Judge Pius asked that at the beginning. Yes, there is a rule that says you're only going to get 80%. What rule is that? Identify the number of the rule? I don't know the number of the rule. I know that that's what was discussed by all the witnesses and in the indictment. But I couldn't figure out where that comes from. I don't know the rule. You go to your insurance company. Except the three witnesses in the indictment. You go to your own doctor and your insurance company says we're only going to pay 80%. Exactly. Yeah? Okay. Thank you. I'm going to switch gears a little bit. My name is Amitai Schwartz. I'm representing the defendant, Patrick Sobine. I want to talk about the abuse of the position of trust, the legal issue, and I want to talk about the reference to national origin in the sentencing. Focus on the first one. Okay. With regard to the position of trust, the district judge added two points for Mr. Sobine's sentencing with respect to finding that he had abused a position of trust within the meaning of the sentencing guideline 3B1.3. The sentencing guideline makes it quite clear, and this court's law makes it quite clear that Mr. Sobine had to be in a professional or managerial position that entailed a substantial amount of discretion. Let me ask you. I think our law is not quite clear on this, and this is why it's an interesting question to me. We've got a mem dispo out there, not precedential, but certainly something we can take a look at, and we've got, what, an 11th Circuit opinion on one side and a 5th Circuit opinion on the other. So I'm not sure the law is clear. Tell me why we should adopt the 5th Circuit position rather than the one in the mem dispo and the 11th Circuit position. Well, because... I understand our law to be pretty clear that it's discretion is like the key. That's exactly right. With discretion, you're in a position where you have the management authority to exercise significant discretion. But discretion with regard to the claims against Medicare, and in this... The victim is Medicare. That's right. And in this case, Mr. Sobine would not have gotten a dime without Dr. Colostro's exercising her discretion to write a prescription. He wouldn't have gotten a dime if he hadn't certified either to Medicare that everything he was doing was proper. Right. And so that certifying is lying. When he did that, he was lying. But that's the crime. That's the fraud. Right. But now we look at his position. Correct. Right? And his position, he was the managerial position, and he exercised discretion. So let me follow that up. If you take Judge Morgia's question, what discretion did Mr. Sobine exercise when he sort of filled the order that the patient needed an electric wheelchair? He didn't exercise any discretion. Because he was like a pharmacist. I'm trying to read the record to see exactly what these guys did. They talk about him having to go out and do a home assessment. Correct. A home assessment. Right? And so he's got to look at the house, look at where the patient lives, and see if the motorized device can get around in the facility. Well, that's not discretion. So could Sagan have gone out to the apartment and looked around and said, you can't, a motorized vehicle will not fit in this place. I'm not going to approve it. I'm not going to fill the order. Is that discretion? No. Why not? Because it doesn't fit. There's no discretion exercise. It either fits or it doesn't fit. You know he does more in this case than just simply get the order from the doctor and say, order for motorized wheelchair, I fill it. He's required under his deal with Medicare to go out and take a look around and determine whether this is appropriate for the client. So why isn't that the exercise of discretion? I'm not sure that's the right test. It's a ministerial act. The exercise of discretion is the decision whether or not the patient or the Medicare beneficiary needs, medically needs, to use a power wheelchair. That's a decision that's made by the doctor, not the supplier. The supplier must do more than simply get the doctor's prescription. The supplier must then evaluate the situation. The doctor looks at the person medically and says, here's somebody who needs this wheelchair. The supplier then goes out and makes an evaluation of whether or not, given all the circumstances, this is something that works for them, right? Or the type of machine. Type of machine. But that's hardly a medical decision. That's hardly a professional decision. That could be done by delivering. Well, I hope not. But I tend to agree with you that it's not a medical or professional decision. What I'm struggling with is our case law that says as long as it's a discretionary decision, then it fits within this managerial side. I'm not sure that case law is right, but that's what our case law says. So isn't it a discretionary decision? No, it's not. He's like the pharmacist. I mean, the doctor writes the prescription, and it's the same kind of thing. My pharmacist doesn't come to my house or ask me. Pharmacists ask what other meds you're taking, for example. Sure, but the pharmacist doesn't evaluate whether or not this medication, whether the doctor's prescription would work for me, does he? No. But in this case, Mr. Soblein didn't either. The only area where he had any, let's call it leeway, was in this measurement thing, and the measurement thing could have been done by anybody. What relevance to this case does the intermediary have? I know the intermediary didn't do its work, otherwise we wouldn't be here. Right. But assuming the intermediary is supposed to do its work, and I apologize. I always get the Fifth and the Eleventh Circuits confused because they used to be one. Right. But at least one of these cases say, look, Aetna was an intermediary. We didn't really trust you. That's why we had the intermediary. What relevance does that have? The relevance is that the Eleventh Circuit picked up on that and found that that was an alternative reason why this position of trust didn't apply, because the position, because the, let's, for sake of argument, call it a fiduciary relationship, was between Soblein and Noridian, where the claim was submitted, rather than with Soblein. Does the record reflect anything about the duties of the intermediary? No. No, it does not. I mean, I looked for it and couldn't find it. No, it doesn't. It just, I mean, one of the witnesses, I think it was Ms. Witten, testified that she worked for Noridian and she explained how it all worked. And Noridian apparently just signed everything that came through, apparently. But there's no testimony in this record about what they were supposed to do. Correct. Correct. In this case, I think, didn't a representative from Noridian testify about the honest system and said the medical equipment providers have an obligation to submit honest claims? Yeah, but that's the fraud. I understand that, but it seems like that's not. Sounds like being an intermediary is a great job. You rely on the suppliers, you don't check them. But what I'm arguing is that if the position of trust enhancement applies to someone like Soblein, then anybody who commits fraud, Medicare fraud, is essentially going to be qualified for this enhancement. Because you're looking at this. Just give me some pause about any government contractor. They all sign, you know, we're going to submit truthful receipts or whatever, invoices. The purpose of this sentencing guideline is to basically get doctors, lawyers, brokers, accountants, and people who are, you know, invested with this trust, not to get a guy who's basically a purveyor or a vendor of durable equipment. He was convicted of fraud, but the question is whether, you know, what about his role makes him eligible for this enhancement? And we contend that there's nothing about this role in particular. The doctor, for sure, and in that memorandum opinion that Judge Hurwitz referred to, who was I think a nurse practitioner, somebody who stood in the place of a doctor, but Soblein didn't stand in the place of a doctor. He was basically delivering and processing these orders. With regard to the, I'll take the last couple minutes to just talk about the national origin issue. This came up in the sentencing. I want to point out that Mr. Soblein received a sentence that was in excess of the guideline range, in excess of what the probation office recommended, and in excess of what the government recommended. And at the very end of the sentencing, at the most solemn moment of that sentencing proceeding, the judge focused in on his immigrant status. He mentioned the word immigration twice. But hadn't your client raised, or hadn't your side raised that issue? No. He mentioned his letter to the court. Yeah, he submitted a letter, and there's one line in there that says, I immigrated to the United States of America in 1984 on a student visa. And then he talks about the American dream. But he pled basically for mercy based on the fact that, on the basis of his immigrant background. I mean, so it seems like the district court was trying to address that. I'm trying to figure out how it was improper. Why do you think it was improper? I read the letter differently, and I think that it's certainly susceptible to my reading, which was that he pled for mercy on the basis of his family. He talked a lot about his family. He talked about his wife. He talked about his children. He talked about his parents. And the gist of the letter was, you know, I'm a self-made guy, and I have a family, and I'm close to my family, and I love my family, and show mercy. Mercy, mercy, mercy. And what the judge focused in on, or what the district court focused in on, was the fact that he wasn't sure whether Mr. Sobine respected the immigration laws of the United States. Well, there was some allegation that way back when he had engaged in marital fraud in order to immigrate. But that's a pretty serious matter in the sense that he said, I'm not going to pay any attention to that. Except that then he said, but. But I'm not sure he respects the immigration laws of the United States. And then the next thing he talks about is deterrence. So did he get the above guideline sentence because he was being deterred? Well, those are 3553A factors. Yes, they are. But this is one factor that's not supposed to be taken into account, which is national origin. Thank you. Yeah, and I guess the question for us is whether he took it into account or merely mentioned it. In response to your client saying, give me a break, because I know. Well, we will never know whether he took it into account, and there's no way to really know. But the question is, it's the appearance of justice and the appearance of what occurred here. And the appearance is that immigration, his immigration and national origin status was a factor of some sort. Thank you, Mr. Schwartz. You've got lots to talk about. Good morning, Your Honors, and may it please the Court. My name is Meredith Osborne, and I represent the United States of America. First, on the argument that Abad raised on sufficiency grounds, the government introduced the following evidence that Abad knowingly participated in the Medicare conspiracy. First, and critically, Abad asked to join the conspiracy. He approached Colostro about recruiting wheelchair beneficiaries and asked her about receiving money for those referrals. Second, as was discussed before, Abad did lie to the FBI about his involvement. During that initial interview, he lied about talking to Sobhain, either prior to the interview or afterwards. He then later admitted that he lied, but also during his initial interview, the FBI agents asked repeatedly, is there anything else that you want to tell us? And he said no. So I think the facts of his minimization clearly weighed in favor of his consciousness of guilt, and the jury was entitled, as they did, to find that that was evidence of his guilt. Third, Abad accompanied Colostro on her patient visits, but he also accompanied Sobhain on the visits to deliver the wheelchairs on occasion, and he observed patients who could walk, patients whose homes were too small or too cluttered for a wheelchair to operate, or apartments which were inaccessible from the street by a power wheelchair. The testimony of both Colostro and the patient, specifically Zosima Leguez, about her and her husband, Clairo, goes particularly to that point. Fourth, Abad was actually paid for the referral of his own wheelchair, and I heard Abad's counsel argue that Colostro was his personal doctor, but there was also evidence that Abad's previous doctor had rejected his request for a power wheelchair on the grounds that it would be contrary to his rehabilitative treatment plan. So I think the jury was entitled to find that, based on these facts, Abad knew that this was a conspiracy to commit Medicare fraud. And finally, Abad and Saavedra actually competed. There was evidence that Abad and Saavedra competed about who would get paid for a certain referral, and that Abad bragged to Saavedra that he had three referrals that he was getting paid for at a certain time, where she only had one. If there are no questions on the sufficiency, then I will move to the loss calculation. First, on the actual amounts of loss, the district court found that Adobempe was responsible for $1.7 million in loss, but the restitution that he ordered was $1 million, just over $1 million, the restitution being the amount actually paid. So I think those are the amounts that this court should look to when it's determining the intended loss versus the actual loss, and if you look at the difference between those two amounts, they do not actually impact Adobempe's guidelines calculations. So if the intended loss were $1 million, you're saying the guideline would be the same? Yes, Your Honor. Okay, so how did the judge get from $1.77 to $1 million? Because $1.77 was the amount billed, so I understand that. How did it get down to the million? That was the amount that Medicare actually paid, paid out on the DEBS and Dignity claims during the period of the conspiracy that Adobempe was held to be responsible for, and so that time period began when Dignity first billed Medicare and continued through July of 2011. So that's where you get the time period, and that's why you get the $1 million. What do we do with the 80% argument that she knew from the beginning that everybody knows and so she would have known about the 80%? Well, first, as Your Honor's pointed out, there is no rule and there was no evidence that you can only get 80% of the amount. You said that you alleged it in the indictment. Is that correct? So there's two things. So there's a Medicare allowance amount, which Jody Whitten testified to. She was the expert from Noridian, trained as an expert on the Medicare rules, and she testified about the 80% versus the 20%. So there's the Medicare allowance, and then there's the 20% patient copay. And the evidence at trial was that Sobein actually had the patients fill out forms saying that they were indigent, that they could not pay the copay, and therefore they would be eligible for Medi-Cal coverage of that copay. So in fact, the evidence showed that Sobein fully intended to collect that full amount. Then there was separately the evidence about... But not from this victim. No, but intended loss, I think, is... Isn't it from this victim? Yes, that's true. It's from intended loss for Medicare, but I don't think that the record supports the argument that he only intended to collect 80%. The other testimony was Dr. Fullerton's testimony about the Medicare allowance that fluctuates over time, and so the evidence was not that there's a fixed Medicare allowance for power wheelchairs. It's rather that there is an allowance, that it is lower than the amount billed, but it's not... And in any event, there was no evidence that Sobein himself, or Adebimpe, knew about that allowance and intended to collect only up to that allowance. They also reserved the right to collect from the patients themselves. I'm interested in the 1 million versus 1.77 because your opponent says the real number is 8.8. I think that's because we didn't let him get to his DEBS argument. So would you deal with the DEBS point and then tell me how we get the only down to 1 million? Yes, Your Honor, the district court correctly found, and again, this is, as Judge Merguia pointed out, reviewed for clear error, that Adebimpe was responsible for both the DEBS and Dignity billings during the conspiracy period. Okay, so now, given that assumption, tell me how 1.77 became 1. Those were the actual amounts paid out under Dignity and DEBS, the claims from the beginning of the conspiracy to the end? Yes, Your Honor. Okay, and your position is that even if we chose 1 as the intended loss, the enhancement would be the same? Yes, Your Honor. It's true that for Sobein, so the loss amount for him was 2.8 million, and the restitution ordered was 1.6, so it would have decreased his guidelines range by two levels, his offense level calculation. But not for, I'm sorry, I'm having trouble with the names, Adebimpe? Not for Adebimpe. Counselor just mistaken when he said it would result in a four-level reduction. Who's representing Sobein? Oh, that's right. Well, one of them was. No, for Sobein, Sobein is still just a two-level reduction. Four-level, counsel was referring to another adjustment downward besides the amount. But at least I want to be clear on this, and the guidelines are confusing enough. But as to Adebimpe, if we choose $1 million as the intended loss amount, it would not affect the sentence? Correct, Your Honor. 16 levels, right? Yes, Your Honor. No, Adebimpe, her offense level was calculated at 24, and that resulted in a guidelines range of 51 to 63 months. And then she received a sentence of 51 months. But the loss of $1 million, though, that amount resulted in a 16-level bump? Yes, Your Honor. I would also just argue that Sobein did not, or Adebimpe, did not rebut the Popov presumption, and that the cases that they rely on do not involve the ‑‑ some of them do not involve the guidelines that specifically creates that presumption, the presumption of the loss amount in a Medicare context. Am I right in thinking of the way this works, that the billings give rise to the presumption? Yes, Your Honor. And then it's the burden of the other side to rebut it? Yes, Your Honor. And the judge will make a factual determination whether they rebutted it? Yes, Your Honor. Can you ‑‑ I don't want to move you on to ‑‑ The part of this case that gives me the most pause is the abuse of trust enhancement. And I don't want to redirect you earlier than you want to be. But when I look at the guidelines and I look at the commentary and put aside all the conflicting case law out there, it seems to be aimed at lawyers, doctors, accountants, stockbrokers. That's what the commentary talks about. These guys are wheelchair vendors. They're dishonest wheelchair vendors and they deserve to be punished. But why are they in a position of trust to the government? So there are a few reasons, Your Honor. First of all, you need to have specialized training to be a durable medical equipment supplier, as Sobein and Adebimpe were. And the evidence ‑‑ What do you mean by training? The evidence, Jody Whitten testified that Sobein went to conferences and that he received training. I believe some of it from the ‑‑ Did he have to take a particular training program in order to get certification from Medicare? Yes, Your Honor. And received continuing training, to continue to attend conferences and trainings to learn about the Medicare rules and any changes to the Medicare rules that occur over time. I also want to draw Your Honor's attention to a distinction, and I think this was raised before, between a fiscal intermediary, which was the case in the 11th Circuit cases. Their Aetna acted as a fiscal intermediary. So the Aetna actually reviewed claims and determined whether or not they were reimbursable under the Medicare rules. Here, Noridian is an administrative contractor. An administrative contractor, as Jody Whitten testified, simply inputs, takes the codes that are given to it by the DME supplier, inputs them into a computer program, and then the DME supplier is automatically paid. If they use that ‑‑ Does Sobein input any codes in the billing? The DME supplier, Jody Whitten testifies, uses a KX modifier. So that is a particular code that he submits to Noridian to tell Medicare that the beneficiary meets all the requirements and the claim can be processed for payment. So your argument is that here, the intermediary, the presence of the intermediary here really doesn't demonstrate a lack of trust. It's just to make sure that the codes are input correctly. Correct. It's simply like having a PayPal system. In between, when you pay somebody, you can use the service, essentially, that the government contracts with in order to make sure that, you know, everything is electronically submitted through the system. So explain to me then how this ‑‑ I'm trying to really understand how this works. So the doctor prescribes, makes an assessment that a patient is eligible or needs, medically needs, I guess, a mobilized wheelchair, right? Yes, Your Honor. The doctor makes that, writes the prescription. Writes the prescription authorizing medical determination that a wheelchair is necessary. Well, prescribing the wheelchair, just like any other form of ‑‑ Like a drug. I mean, you need this drug. Okay. So then, just like you would take a prescription for a drug to a pharmacist, you take this prescription to the durable equipment provider, correct? Yes, Your Honor. Okay, so he gets the prescription and he says, okay, you need this wheelchair. Yes, although I would ‑‑ Why is that exercising the kind of discretion that a medical doctor would exercise, or a lawyer, or an accountant? So I would just point, Your Honor, to the testimony of Dr. Fullerton, where he described the process being a little bit more intensive than what you just described. I'm trying to get you to help me understand what was in the record. Yes, Your Honor. So Dr. Fullerton testified that the doctor's prescription would then go to the DME supplier directly, and then the DME supplier would go out and do a home assessment. And there may actually be some back and forth between the doctor and the DME supplier if, for instance, the patient's home was not suitable for a power wheelchair. Is there another type of medical equipment that the patient could actually use that would give them the same benefits as the power wheelchair? So in a case that doesn't involve fraud, in the normal case, at the end of the day, what is the DME supplier saying? Is he saying, no, not a motorized wheelchair, but something else? Just before you answer Judge Horowitz's question, when he goes out to the house to make this home assessment, is he following a certain protocol that is just, as Mr. Schwartz said, is just a routine kind of thing, a checkoff, just looking for certain things, and there's really no discretion? Or is he making some sort of assessment and judgment and a judgment call that, you know, this is not a place for a wheelchair, a motorized wheelchair, or you need something else, you need another kind of wheelchair, or whatever, go back to the doctor? What is he doing? I think that that's exactly what Dr. Fullerton's testimony goes to, which is that the DME supplier had a responsibility to go and measure, measure doorways, measure access paths. This is not just... But is that discretion, or is it just... I mean, if the doorway has to be wide enough for the wheelchair, it's not like you're saying to the DME supplier, look at that one and tell me whether in your discretion you think it's wide enough. You look, you measure. Is this a discretionary decision, or is it just that he's exercising a function to make sure that it fits within the apartment and can move around? Because it's the exercise of discretion that our cases focus on, and, you know, if the DME supplier said, look, the apartment's big enough, but I just don't think you need a motorized wheelchair, I assume the applicant could have him overruled, because it's not his grounds to determine whether you need one. It's only his grounds to determine whether it fits and can get into your apartment. Aren't those really ministerial functions? I'm not sure this is any different than a CPA, for instance, saying that you qualify or don't qualify for a certain tax deduction. It seems, you know, he's trained as to where, you know, he has specialized training that he's using to determine, based on the home assessment, whether or not the power wheelchair is appropriate for this individual. As I said, Dr. Fullerton testified that there was a relationship, you know, a back and forth between, in the ideal case, a back and forth between the doctor and the DME supplier, so that if the home assessment came back and said, no, a power wheelchair would not work here, there would be a back and forth. So I think that does display discretion. I don't think that it demonstrates that the district court clearly erred in finding here that based on these facts, Sobein and Arrebente were in a position of trust vis-à-vis Medicare. Are there guidelines in the record that we can take judicial notice of that deal with the assessment? Does the assessment deal with anything more than the ability to maneuver around the apartment or place in the wheelchair? Are there other criteria to be taken into account? I believe the criteria, and I would have to go back. Yes, Your Honor. I think if you look at Dr. Fullerton's testimony, he describes in quite some detail the home assessment process. Does Dr. Fullerton? Yes, Your Honor. What evidence is there that Medicare relied on the defendant's certification or honesty in reimbursing the defendants? Right, so I think that's where we look at Jody Whitten's testimony, and she described how the KX modifier is part of the honor system, and the fact that the claims are paid without anybody checking. If the GME supplier gives that code, there's no, and they're just paid automatically. And you've heard that that seems separate. I mean, is that separate? Do you agree that's separate from the abuse of trust, that doesn't go into the abuse of trust calculation? Oh, no, I think that's a very important fact for the abuse of trust. That's not our case law. It's ground law. Yeah, that's why I was asking earlier. Our case law seems to say if you're exercising discretion and you're in a managerial position, that's what abuse of trust is. Because I take it you could rely on somebody who wasn't exercising discretion. If I asked my carpenter how big the doorway was and he gave me the wrong number, I would be relying on him, I would be trusting him, but he wasn't exercising discretion. Well, I think it's the combination, Your Honor. Why do you have to have that exercise of discretion? I think the managerial discretion is the management authority. It doesn't necessarily have to be discretion or management over somebody in Medicare. It can be management over other employees. Do you agree that our case law, I'm not sure it's right, requires the exercise of discretion? I think that in Lorienti, this court said that's a decisive factor, but it's not the only factor. It's the professional or managerial discretion. So what's your best argument? I'd like to hear your best argument why he should get an abusive trust upward adjustment or why it should be sustained at this point. I think that the best argument is that Sogbind was trained to become a DMV supplier, that Medicare relied on his honesty in certifying that the PWCs, the power wheelchairs and accessories were medically necessary and appropriate for the patient in their home, and then automatically paid those claims out based on his certifications of honesty,  and that so unlike just a simple person submitting a tax claim, that Medicare was relying on his statements based on his special training that he received on the Medicare rules. That's the best argument, that he abused his position of trust in this case. And made it a discretionary decision, and he was a managerial discretion. Yes, Your Honor, and I think the rationale is very similar to what the Fifth Circuit held in Willett, where Sogbind owns the company, Medicare relies on his honesty in reimbursing the claim, and Sogbind used that trust in order to perpetrate this fraud. In Willett, similarly, Medicare relied on the provider to use a correct code. And again, this was again a situation where Medicare relied on this KX modifier code to go ahead and pay claims, and only then did audits. I'm sorry to interrupt. Under your theory of the case, why aren't all government contractors in a position of trust? People sell the government things all the time. Or they bill things to the government. The government trusts them not to overbill. Sometimes they commit fraud. Why aren't all government contractors subject to this abuse of trust enhancement? I'm not sure whether all government contractors go through specialized training about how to submit claims. I'm not sure whether all government contractors, certainly not all, there's a massive contracting system with the government. It's enormous. They have to be certified. They have to be approved. It's very similar to what's happening here. It just doesn't seem like this, in the commentary, that this particular guideline was designed to reach everybody who deals with the government. Now, I understand it deals with private victims, too, of course. But I guess my question is I would have some hesitation in arriving at a result in this case which meant that everybody who deals with the government gets an abuse of trust enhancement. So tell me why that's not so. I guess I'm not clear why there would be a concern about making sure that companies, that individuals who are taking money from the government to provide essential government services that benefit the needy people in our country, that they are not exploiting those positions for their own personal gain. That's the guideline. It just deals with that directly. They're not exploiting the needy people. They're exploiting the government. They're exploiting the government. If the government is a victim, five points. Your Honor, but here these are the... If the government, you're stealing taxpayer money, you should pay a heavier price for your unlawful conduct. That would make some sense, but it's not what the guideline says. So I'm trying to figure out whether or not you can give me a more narrow interpretation of this guideline. Your first response is that would be cool. Let's do this. And I guess my question is I don't think it's so cool. Can you give me a narrower interpretation of the guideline that wouldn't lead me down this garden path? Sure. And I didn't mean to suggest it and be so cavalier about it, but I think the distinction between Garrison and Willett is a good distinction. In that case, there's a fiscal intermediary who is actually going in and checking the company's claims and determining whether or not they qualify for reimbursement by the government. And here you have the actual supplier certifying to the government. In that case, Aetna, arguably, and Garrison had a position of trust vis-a-vis the government because once they submitted those claims to the government, the government was relying on them that those claims should be paid. And very similarly here, I think the government was also relying on dignity and debts, their accurate representations in order to go ahead and just pay the claims automatically without any further certification. So that exploitation, I think if you sign up to be a DME supplier, you go through the training, you say, you can just pay my claim. If I try to get a claim paid on my flexible health care account, I have to submit directly to my claims administrator all kinds of documentation that show that I actually received these medical services. Here, all that dignity and debts had to do was submit that KX modifier and their claim would be paid. They kept their files in case there was an audit for seven years, but they did not submit all of that additional documentation, either to Meridian or to Medicare. I want to move on. I have one other question here. Assume for a second, the analogy is not a good one, but it's one that your opponent is a pharmacist. I go to my doctor, and my doctor gives me a prescription, and I take it to the pharmacist, and he fills it. He's not in a position of trust vis-a-vis the government if the government has billed for it. Is he, or is he not? He's professional. He's had professional training. He exercises some modicum of discretion, which is to say he may say to me, do you have any things that interact with this or whatever, but my experience is they get filled 100% of the time. If the government is paying for that, does that give rise to the trust enhancement? I'm sorry, Your Honor. I'm just not sure because I don't know what type of relationship a pharmacist has with Medicare, if they're responsible for certifying anything with Medicare, that the prescriptions that they fill out are actually covered, if they have any discretion in terms of choosing a generic versus ñ I think there's a lot of ñ Yeah, I'm assuming not overbilling. I'm assuming whether or not it's medically necessary, which is the issue in this case. My doctor says you need drug X. I go to the pharmacist. He gives me drug X. He's a professional. He's had all kinds of professional training. He's got, under my hypothetical, a modicum of discretion, which is to say he can say to me, gee, you know, are you taking drug Y because that might interact and et cetera, et cetera, but generally he just fills it. Now, is he in a position of trust versus the government? I know you're saying I don't know what else he's signed, but those are the ones that trouble me. Those are the ones at the edge of this that trouble me. That's why I'm asking the question. I understand, Your Honor, and I don't mean to resist the hypothetical. Maybe you can answer it. Yeah, I think the crucial point of that is what the relationship with the pharmacist is in terms of billing Medicare, and if the pharmacist is automatically reimbursed, then perhaps he is. Judge, there's one argument left that you haven't addressed, and that's the immigration remark or that the sentence was based on his immigration status, and I'd like to hear from you. Sure. I think this argument is pretty well laid out in the brief. However, I would just remind the court that the immigration fraud was actually brought up in the PSR. The probation office recommended that it be considered when the district court considered it under the 3553A factors. And so it was within the context of this conversation added to it the letter, which I think respectfully that there's some minimization going about the level of the discussion of his immigrant background in that letter, but I would refer you back to it. It's in the excerpts of record talking about how he came to this country and sort of pulled himself up by his bootstraps. The district court was clearly outraged by his exploitation of what he considered to be what this government had to offer, particularly about Medicare and the important role that it plays in providing services for people who cannot afford it. And that's what was at the crux of what he said at sentencing justified his above guidelines range sentence. So I think if you look at the entire sentencing transcript, everything that Judge White said in that transcript and not just the fact that he mentioned immigration twice in the context of responding to his letter and also about this alleged immigration fraud, this court's case law tells you to look at the totality of the record and here that supports affirming his sentence. District judges say sometimes they talk a little bit too much rather than being somewhat reserved in their comments when they're dealing with their sentencing decisions because it's a tough call and they want to offer an explanation as to why they're imposing a particular sentence and sometimes it's going to go a little bit too far. I would just only disagree to the extent that I don't think here the district court went too far. I'm not saying he did, but I said sometimes they do. That is not this case, Your Honor. If there are no further questions, I would ask this court to affirm all three defendants' convictions and sentences in this case. All right. So now you each have a little bit of time. I'll give you each a little bit of time for a rebuttal. Thank you, Your Honor. I'd just like to go down those five factors that the government talked about, showing as the government contended that Mr. Abad had joined the conspiracy. That's the first thing. The government said that Mr. Abad asked to join the conspiracy. That's an exaggeration like most of the government's characterizations here. If you look at the supplemental except of record at page 138, he was asked, do you recall how the subject came up with Mr. Abad? He just brought up the question, brought up the question, can I have you see the patients I refer? He's not saying can I join the conspiracy. He doesn't know anything illegal is going on. There's nothing about that. He's also asked, did you ever pay Mr. Abad? Did you ever pay Mr. Abad? No. He's not joining any conspiracy by that statement. He's asking if his personal doctor can see other patients who he refers. The second thing, she said that Mr. Abad lied. But it was interesting because the government somewhat walked back this claim of minimization because Mr. Abad didn't minimize his role in the offense. He didn't minimize his phone calls. He didn't minimize who he talked to. The only thing that he minimized was post-event, after he learned that the FBI was investigating this affair, he talked to Mr. Sobine. Mr. Sobine told him that they shouldn't be talking. And that's what he lied about. And in the next interview, he admitted that, yes, he had talked to Mr. Sobine after he learned the FBI was looking for him. That's the only thing that he lied about. And post-conspiracy event is not sufficient to hang your hat on to show that someone's a member of a conspiracy. The government argued that Mr. Abad accompanied Dr. Colostro on home visits. And those home visits at page 336 in the excerpt of record, at page 342 in the excerpt of record, indicate that she said those visits were, the wheelchair prescriptions were medically necessary. This statement that she indicated that the wheelchairs were medically necessary was acknowledged by Judge White in his order resolving post-trial motions at page, at excerpt of record 27. Yes, he was in fact paid $100 for his own wheelchair after knee replacement surgery. That certainly doesn't show that he's a knowing participant in any fraud. And finally, the government argues that he competed with Ms. Saavedra over referrals of wheelchairs. In fact, there was testimony about a conversation between Mr. Abad and Ms. Saavedra. He said, yes, I was able to find three people that needed three wheelchairs. You were only able to find one person. He was fully disclosing what he was doing. He told her what he was doing. And unlike Saavedra, who was told not to talk about things, unlike Colastro, who was told not to talk about things, he was fully talking about everything because he didn't know there was anything going wrong. There's no minimization here. There's only, the only lie was about post-event conduct, and that's not enough under this course. Thank you. Your Honors, the 80% rule was put before the jury by government expert witness Jody Whitten, whose job it was to teach DMEs what the Medicare rules were and who worked for the company that actually processed Dignity's claims. As for the 50% rule, Let me just clarify one thing. So the instruction, did it just deal with how the Medicare rules operate? You know, just the rules, how to submit a claim, what to do. And what the Medicare rules are, yes. So do those rules require him, a DME provider, to actually have some training in the role as a durable equipment provider? They are given training. I don't know what the exact requirements are, but it was her job, Jody Whitten, government expert, to give that training. And she knew the rules and testified about the 80%. And the two case agents who testified about the 50%, which also takes into account the Medicare allowance, were DHS case agent Ross Reed and special agent Elizabeth Hadley. And all the record sites to all three of those were at pages 25 to 26 of my reply brief. Secondly, Your Honor is correct that as to the difference between the 1 million restitution, it was because I didn't get to my... And I cut you off. No, no. But I didn't get to my DEBS argument. Most of that is in the brief. I would add one thing, which is that the only place in the indictment itself where Ms. Adabimpe is in any way tied to DEBS is on page 9 where MC and VC, two alleged recipients, were said to have been served by both DEBS and Dignity. It doesn't say who did what or who was doing what at Dignity at the time, but I would point out that neither of those witnesses testified. So, okay. And my last point in my last three seconds is that it doesn't matter which of the two arguments you accept. If you accept the 80% of the Medicare allowance argument or if you accept the DEBS argument that she shouldn't be held responsible for DEBS, they both come to the same result, which is a four-level decrease in my client's sentencing. That's what I thought you said. I'm sorry? That's what I thought you said. Yes. Either or. You don't have to accept. Right. But if we accept the government's argument that it's a million dollars, then it doesn't help you. If you accept the government's argument that she should be held responsible for a loss of a million dollars, then, yeah, I mean, I'm arguing two different reasons why that's true. I understand, but I wanted to make sure that the government's argument was fact, was computationally correct. You don't dispute that. I don't dispute that if you include DEBS and you don't take into account the 80% and the Medicare allowance that it comes to slightly over a million, although I will add that in my brief I discuss other lesser issues that could affect it if it's close, such as wheelchair prescriptions were made by doctors other than Colostro and things like that. So I can't say for sure how close it is. You have a separate argument that some of them were okay. Yeah. Okay. So there's multiple arguments, but on the major two, it's either or. It comes to the same result, minus four levels. Thank you, Ken. Thank you. Mr. Schwartz. I just want to answer Judge Hurwitz's question about where in the record or what can you take judicial notice of the requirements for the home assessment. In the Excerpts of Record, Volume 6 of the Sobein Excerpts of Record at page 1303. So it's ER 1303? Correct. There is a copy of Government Exhibit 55, which is a local coverage determination, which Jody Witten, the expert, had explained are essentially the Medicare rules. And this, with regard to home assessment, is very simple. It just says, prior to at the time of delivery of a power wheelchair, the supplier or practitioner must perform an on-site evaluation of the beneficiary's home to verify that the beneficiary can adequately maneuver the device that is provided, considering the physical layout, et cetera, et cetera. There must be a written report of this evaluation. So the only thing, according to this local coverage determination that Mr. Sobein had to do, was to verify that the wheelchair would fit in the home. That's not an exercise of discretion. And so the rule is right there, and it's very tightly circumscribed. It's very different from a doctor or a lawyer. I also want to just point out that Mr. Sobein also made a loss calculation argument with regard to sentencing. Thank you very much. All three of us thank the panel for giving us the expanded time. Thank you. Thank you, Mr. Schwartz. Thank you, counsel. Thank you. Thank you, counsel. Matters submitted now, and that ends our session for this morning, I believe.
judges: Paez, Murguia, Hurwitz